*Squire, Sanders & Dempsey, E. G. Johnson* and *Hale C. Johnson,* for defendant in error.

---

### BENEFICIAL INSURANCE.

[Circuit Court of Lucas County.]

ELIZABETH CROCKETT v. ORDER OF THE RED CROSS ET AL

Decided, January Term, 1903.

*Mutual Benefit Societies—Requisites of Notice of Assessment—Rights of the Beneficiary.*

1. Where a provision of the constitution of a beneficial order requires that there should be actual notice to members of the levying of an assessment, such notice must be in fact given to a member before forfeiture of his rights will result from failure to pay the assessment, notwithstanding a rule of the order that a member becomes suspended *ipso facto* from all benefits of the beneficiary fund by failure to pay an assessment.

2. A beneficiary of such an order can not be deprived of his rights under the certificate by the fact alone that the policy holder became dissatisfied with the order and declared his intention to withdraw and pay no further assessments.

PARKER J.; HAYNES, J., and HULL, J., concur.

This case comes into this court on appeal. The plaintiff says that the defendants named (The Order of the Red Cross; The Knights of the Red Cross; The Subordinate Commandery, known as The Toledo Commandery No. 4, Order of the Red Cross, and The Knights of the Red Cross) are corporations under the laws of Michigan and Ohio; that the business of the companies is chiefly fraternal insurance—class insurance, as distinguished from the old line method of insurance; that James K. Crockett in his lifetime was a member of all the associations named, by virtue of his membership in the Toledo Commandery No. 4 of the order; that on September 24, 1888, the order issued to him a beneficiary certificate for the sum of $1,000, payable to the plaintiff, as beneficiary, upon the death of the insured, if he should comply with the rules of the order with respect to the payment of assessments and otherwise hold and keep himself in good standing in the order; that he complied with all these requirements, and was in good standing at the date of his death, which occurred on September 23, 1900; but that the defendants refused to recognize her claim under this certificate, and therefore she prays that they may be compelled to levy, collect and pay over to her such assessments as will make up to her the amount promised in the policy, to-wit, $1,000.

Various issues presented by the answer have been eliminated during the trial of the case, so that the only issue remaining is that presented by the averment of the answer, that the rules of the order required that:

"All assessments must be paid on or before the twenty-eighth day of the month, and any member failing to pay the assessment by midnight of the date for which the assessment is called, becomes thereby *ipso facto* suspended from all benefits of the beneficiary fund of the order; that on or about the first day of August, 1900, two assessents were levied and called for under said revised constitution and laws, and that notice, as provided under the laws of said order, was mailed to each and every member of said The Order of the Red Cross and Knights of the Red Cross and to the said James K. Crockett; that the said James K. Crockett failed to pay said assessments on or before midnight of the twenty-eighth day of August, 1900, and became

thereby *ipso facto* suspended from all benefits of the beneficiary fund of said order."

It will be observed that the answer does not contain an averment that this notice was in fact *served* upon James K. Crockett or that he ever received it, nor does it advise us who it is claimed mailed the notice to him. To the answer and supplemental answer a reply was filed by the plaintiff. I read from the reply:

"Plaintiff says that she denies that deceased ever received any legal notice of the pretended assessment made payable August 20, 1900, and denies that any such notice was ever issued to the deceased."

In so far as the denial of the receipt of the notice is concerned, it is a denial of something not averred in the answer; but the case has been tried as if the issue were presented here whether the notice if issued and mailed was ever received by James K. Crockett in his lifetime. It appears that in the course of the business of the order, it was customary and perhaps required that a notice should be issued on the first of each month of the assessments payable upon the twenty-eighth of the month, and a notice, as averred in the answer, was issued upon August 1, 1900, calling for the payment of assessments Nos. 28 and 29, payable August 28, 1900, and another notice was issued upon September 1, 1900, calling for assessment No. 30, payable September 28, 1900; Mr. Crockett having died upon September 23, 1900, the notice of September 1, 1900, was the last one issued before his decease. According to the testimony of his wife, the notice of September 1, 1900, was found among his paper after his decease. The notice of August 1, 1900, was not found there, and she seems to have had no knowledge of it. The testimony shows that Mr. Crockett was rather lax and dilatory about paying his assessments; that he had not been in the habit of paying promptly; that he had paid some days after the time fixed for payment, to-wit, the twenty-eighth of the month, on a great many occasions during the continuance of his membership in the order. Among the laws of the order, printed in a little book containing the revised constitution and laws of the order intro-

duced in evidence, Section 11, appearing at page 77 of this book, are the provisions:

"All assessments must be paid on or before the twenty-eighth day of the month, and any member failing to pay the assessment by midnight of the date for which the assessment is called, becomes thereby *ipso facto* suspended from all benefits of the beneficiary fund of the order." *   *   *

Section 12 on page 78 provides:

"Members who become suspended for the non-payment of dues and assessments may be reinstated upon compliance with all of the following conditions, and not otherwise, to-wit: By the payment of all arrears for which they become suspended, and all dues and assessments which have subsequently become payable, and upon the consent of a majority of the members of the commandery to which the said suspended member or members belong. Provided also, that no reinstatement shall take effect until the supreme treasurer's receipt for the arrears has been received by the commandery, and a notice thereof received by the supreme scribe. Members who are suspended for a period of one month and less than three months shall be required also before being reinstated to sign a certificate of good health, in form as follows:

"*To the Supreme Commandery of the Order of the Red Cross and Knights of the Red Cross:*

"I, —————, to whom was issued beneficiary certificate No. —— as member of ———— commandery ——————, having been suspended from all rights, benefits and privileges of the order by reason of ———, and desiring to be reinstated in the order, do hereby certify that I am at this date in sound bodily health, and I agree that my reinstatement shall be valid and binding only upon condition that this statement is true in every particular.

"Signed ————————————

"Attest Hall of ——————, Commandery No. ————

"This is to certify that ————— was duly reinstated by a vote of this commandery on the night of ——— 18—.

"————————————— *Scribe.*

"Section 13. Members suspended from the beneficiary fund of the order for a term exceeding three months, shall again be obliged to undergo a medical examination upon the prescribed form of the order, which must be approved by the supreme medical examiner. They shall then receive a new beneficiary certificate, and be in every way received as a new member."

It appears that Mr. Crockett had never been in arrears for as much as thirty days, and that by paying his arrearage in each instance to the treasurer of the local commandery, he was regarded and treated as reinstated; and that seems to have been the universal practice so far as this local commandery was concerned. If a member was not as much as thirty days in arrears, all that was required was that he pay his arrearage; thereupon he was restored to good standing. The provision that the suspended member must pay all dues and assessments, and also obtain the consent of a majority of the members of the commandery to which he belonged, must be construed in the light of this custom, and the construction, in view of this practice, that we give to this provision is, that the member ·obtains the consent of the membership of the local commandery to his reinstatement by paying his dues and assessments within thirty days to the treasurer, and no formal action of the body denominated the local commandery, in session, is required. It will be observed that the assessment in question being payable upon August 28, 1900, and Mr. Crockett having died upon September 23, 1900, he was not more than thirty days in arrears at the time of his decease, and that he was in position to have become fully reinstated merely upon the payment of the double assessment of August to the treasurer of the local commandery, even if he had been duly served with notice of the August assessments.

It appears from the evidence that Mr. Crockett, during the month before his decease, had expressed some dissatisfaction with the treatment he had received at the hands of the order, and some dissatisfaction with these double assessments that had been coming in from time to time, "double headers," as he called them; that when they came in at the rate of two per month, he seemed to think they were too much of a burden, and he expressed dissatisfaction and an intention to quit the order and not pay any more. This mere expression of a purpose to quit the order, while proper evidence in the case on certain issues presented, would not of itself deprive him or the beneficiary of the rights they might have under the certificate.

The real questions in this case, and the only important questions, as we view it, are, first, the question of fact whether Mr. Crockett received the notice of August 1, 1900; and second, the question of law whether the actual receipt of the notice by him was necessary in order to place him in default, so that he might be deprived of the benefits accruing to a member. I will first discuss the question of law that I have mentioned as being involved. Section 77 of the constitution, appearing at page 55 of this book, provides the method of service of notice through subordinate commanderies until an official journal shall be published, and that thereafter:

"Assessment notices shall be printed therein and a copy of. said journal sent direct from the office of publication to each beneficiary member of the order, which shall be in every way a legal notice of assessments, and no other notice shall be given to members."

To the same effect is Section 10 of the laws, appearing at pages 76 and 77 of the book of laws. Now it appears that after this provision was adopted as part of the law of the order, an official organ of the order was published, and that thereafter that official organ containing notices of the assessments was sent out to the members, and that that was the only mode of service of notice of the assessments. It will be observed that this law does not state how this official organ is to be sent out, or by whom; that is not provided for; but it is provided that it is to be sent direct to the member. A construction of this provision that would make the simple mailing of the notice without evidence of its receipt by the member sufficient to put him in default, so that his rights as a member would be *ipso facto* suspended or terminated, would not be consistent with the general principles governing notices as a predicate of a forfeiture, and would not be favored by the law. Such notice could not well be regarded as being sent *direct to* the member, if it had been merely started on its way *toward* him through the mails as second class matter; and the course pursued by this order seems to have been to mail this official paper of the order to the members as second class matter. A provision of the constitution, preceding this as to the sending out of the

official organ of the order, requires that the financier of the local organization "shall *notify* all members of the assessments and when in arrears for dues." The provision in the by-laws as to the form of the notice is as follows, Section 10, page 76:

"Whenever the supreme scribe forwards notices of assessments to the subordinate commanderies, the scribe thereof shall impress the seal of the commandery on said notices and deliver them to the financier for distribution, at the same time notifying the supreme scribe of the date of such delivery."

This provision of the constitution as to the financier notifying the members, we have no doubt requires actual notice to the members, and we can not believe that the mere mailing of the official paper of the order when it was published was intended to be a substitute for the actual notice to the member. We think rather that while the method of notification was to be changed, the very gist and spirit of the provision that the members were to be notified was not affected by the adoption of this new method.

A resolution was subsequently adopted by the order with respect to the manner of serving notices, which was to take effect after July 1, 1899, and we think that this resolution is to be regarded as part of the law of the order in force upon that subject at the time this notice of August 1, 1900, was sent out and thenceforward; therefore it is applicable to the case in hand. Thereafter notice through the *Gazette*, the official organ, was not requisite or proper. The resolution is as follows:

"Resolved, That the *Gazette* be discontinued and assessment notices be mailed direct to each member of the order in folder form by the supreme scribe, commencing July 1, 1899."

The folder was to be thereafter sent out as a substitute for the notice provided for in the *Gazette*. While the provision was not clear as to how the official organ was to be sent out, or by whom, this resolution provides explicitly that the folder is to be sent out by the supreme scribe and is to be sent by mail. Whether this provision was intended to be regarded by the order as the only notice to be sent out—whether no other notice was to be given to a member is not clear. It seems to

us that the laws of the order are hardly capable fairly of a construction that this folder notice is to be the only notice to be sent to a member; that the mailing of such a notice is to answer all the purposes of a legal and valid notification to the member of his assessments. We are rather of the opinion that after the adoption of this resolution the provision that the financier of the subordinate commandery should *notify* the members of assessments by the distribution to them personally of notices under seal was revived, and that the folder notice to be mailed by the supreme scribe was an additional notice, not dispensing with the actual notice that is to be given by the financier of the subordinate commandery. I say that is our construction of the laws after the adoption of this resolution. That is our view of the effect of the adoption of that resolution. But the order seems to have acted upon the other theory of construction, namely, that the folder notice sent out by the supreme scribe was to fulfill all the requirements of a notice. Assuming that the construction put upon this resolution by the order is the true construction, adopting that construction for the purpose of this case, though not giving it our full approval, we adopt and apply to such folder notice what we have said with respect to the notice in the official organ sent to the member, to-wit, that the mere mailing thereof addressed to the member can not be deemed a compliance with the requirement of the law that the member shall be actually notified of the assessment before he can be considered as in default and his rights as a member suspended, forfeited and terminated. We have no doubt but the order might lawfully provide that a notice thus mailed to members should be sufficient to put them in default, though they failed to receive it; but we believe the courts do not and will not so construe a provision for notice in a case of this character unless the language is so clear to that effect as to admit of no other reasonable construction.

I will now call attention to a few authorities upon this question. We had before us recently the case of *Hayes* v. *Yost*, in which was involved the question of how a notice provided for by Section 2807, Revised Statutes, with respect to equalizing boards and their transactions, where they

are authorized to raise the valuation upon property for purposes of taxation, must be served upon the owners thereof. The provision then under consideration is to the effect that such addition shall not be made to such lists returned, without the board having first given reasonable notice to the owner of the property to be revalued. The board in that instance mailed a notice to Mr. Hayes. It did not appear that he had received the notice mailed. It was insisted in behalf of the taxing officers that the mailing of the notice was sufficient. Judge Haynes, in the course of his opinion, had this to say upon the subject, page 25:

"The statute provides that the party shall be given reasonable notice. He is to have a notice that is reasonable, notice as to the time and place, so he may have an opportunity to appear. Notice is to be given to him. The court below found that a notice put in the post office directed to him was sufficient. We are unable to agree with the court in that respect, because we find decisions of the Supreme Court of this state and other courts that lead us to an opposite conclusion. And because, in reason, if he is to have notice, it should be given to him in person, served upon him, so that the board, before it acts, may know that he has received it and that it has jurisdiction over him.

"In the case of *Moore* v. *Given,* 39 Ohio St., 661, the second syllabus says:

" 'Where a statute requires notice of a proceeding, but is silent concerning its form or manner of service, actual notice will alone satisfy such requirements.' "

Now that is the law upon the subject of a statutory notice. But we have authorities directly in point upon the question of notices of the kind provided for in the laws of this order. I call attention to the case of *Castner* v. *Insurance Co.,* 15 N. W. Rep., 452 (50 Mich., 273). It is said in the syllabus:

"The charter of a mutual insurance company provided that members should be *notified* of assessments by circular or verbally, and that if they did not pay within a fixed time they would forfeit protection through their policy. *Held:* That such a personal liability could not attach from merely mailing the notice if it was not actually received."

The question is discussed at page 454, where the court say:

"As to the *second* point, was the fact of mailing the paper which contained the information for the member sufficient of itself to constitute the notification required by the charter? The proposition here is that it makes no difference whether the member ever gets knowledge of the assessment upon him or not, provided notice of it is regularly mailed to him, and therefore the contention is to be viewed on the assumption that he does not get it. The language of the charter is that the member is to be '*notified* by the secretary or otherwise, either by *circular* or a *verbal notice*' (Section 16). The consequences to flow from this notification are admitted to be important.

"A fixed personal liability is to depend upon it; and, further, in case of failure to respond by payment of the sum assessed as communicated by the 'notice' during a given number of days, the member is to stand unprotected by his policy and wholly without remedy or redress in case of loss. In principle it is not so easy to distinguish the nature of the required notification from the office and object of service of process, and there would seem to be as much reason for real notice in the case in question as in the case of an action. The destruction of a mail, or accidents preventing the delivery of matter, or even a considerable delay, might at any time, without fault of the persons insured, eventuate in widespread loss and injustice.

"No construction, open to so much objection, should be admitted, unless rendered necessary by the terms of the charter; and they do not require it. On the contrary, they contemplate that the members shall have real information of the assessment. The provision is not that notice or information shall be mailed or sent or forwarded. The members are to be 'notified'—that is, informed; to have made known to them the fact of the assessment; and this is permitted to be done either by oral statements to the members or by delivery to them of written statements through the agency of the post office or some other. It follows that the second ground of defense can not be supported."

Also in the case of *Wachtel* v. *Widows & Orphans' Soc.*, 84 N. Y., 28 (38 Am. Rep., 478). Also to the case of *McCorkle* v. *Benevolent Assn.*, 71 Tex., 149 (8 S. W. Rep., 516). I will read part of the syllabus in that case:

"The by-laws of the T. B. A. required that notice of its assessments shall be sent to each member and that 'any person who shall fall in arrears for dues or contributions, after thirty days notice, shall cease to be in good standing and shall forfeit all rights and claims to any and all benefits of the association.' It was the custom of the officer charged with the duty to mail

such notice to each member. *Held:* That a reasonable construction of the by-laws required that notice be in fact given to a member before a forfeiture would result from a failure to pay dues, etc., and that mailing to a member through the post office was not such notice."

We therefore conclude that it devolved upon the order in this case to aver and establish by a preponderance of the evidence, at least, that the folder notice of assessment falling due August 28, 1900, was not merely mailed to James K. Crockett, but that he actually received a copy thereof. I have already called attention to the fact that the answer fails to aver that he received a copy, and, in our opinion, it was, therefore, so far as that defense is concerned, open to a general demurrer. But because of the averment in the reply to which I have called attention, and because of the manner in which the case has been tried and presented, we proceeded to consider this defense upon the facts. Now the evidence that this notice was ever actually mailed is not clear nor satisfactory. The supreme scribe, by whom the notice is to be mailed, says that as a rule he did not mail these notices; that he did not address the envelopes containing the notices, but that was done by a secretary or employe in his office. He can not tell whether this notice was actually mailed to Mr. Crockett; he has no recollection or knowledge upon the subject; and the employe in his office is not called upon to testify.

But it is urged on behalf of the association that Mr. Crockett must have received this notice, because in a certain conversation he spoke of the August assessments, the "double headers." It is said that he spoke particularly of these August assessments in a conversation with Mr. Lee, the scribe of the local commandery, but a few days before his death, complaining of the "double header," declaring that he would not pay any more assessments, and saying to Mr. Lee that he might strike his name from the roll of membership. It is doubtless true that Mr. Crockett had knowledge of the August assessments. How he obtained this knowledge, we are not advised. He might have been apprised of the fact in various ways. But we hold that it devolves upon the order to show that he was served with this

folder notice, or that he received it, in order to put him in default; and the fact that the making of such an assessment had come to his knowledge in a roundabout way is not sufficient basis upon which to predicate a forfeiture of his rights and interests in the society.

Mr. Lee testifies that during this conversation Crockett had a paper in his hand, and that in speaking of the "double header" for August, he flourished a paper, or called attention to a paper and wanted to know if the assessments mentioned there or spoken of there were correct; if it was true that such assessment had been made for August. Mr. Lee does not pretend that he examined this paper. He does not say that he had it in his hands. He does not say that it was one of these printed blank or folder notices. If it were a printed blank notice of the kind that Crockett had been in the habit of receiving, it is hard to understand why he should have made any such inquiry of Mr. Lee, because the notice upon its face is perfectly clear. He had been in the habit of receiving such notices for a long time, and he would have understood as fully and perfectly as Mr. Lee did what was stated therein, and that it called for the payment of a double assessment on August 28. It may have been a mere memorandum made by somebody else, or by himself, of the fact that there was a double assessment for August.

The mother of Mr. Lee, who was present part of the time on the same occasion, also says that Mr. Crockett, at the time he was speaking of the assessment, held a paper in his hand. But she does not attempt to describe the paper. It is very significant that upon the trial of this case in the court of common pleas, neither Mr. Lee nor his mother made any reference whatever to this paper or to any paper having been in the possession of or having been shown by Mr. Crockett upon that occasion.

But laying that aside, we are not satisfied by the testimony of Mr. Lee or his mother, or by any other evidence in the case, that Mr. Crockett had come into possession of a notice of these August assessments, such as the supreme scribe was required to send out, and that therefore he did not have the actual notice emanating from the order that is required to put him in default so that his rights might be forfeited.

A few days after this interview with Mr. Lee, Mr. Crockett, who was a very old man, suffered a severe injury, lingered along in misery for a few days, and then died.

Some interesting questions are presented and discussed as to whether there was not a waiver of any default upon the part of Mr. Crockett by certain conduct upon the part of the local organization; as to whether the organization as a whole is not estopped by certain misleading statements made to one who undertook to pay these assessments on behalf of Mr. Crockett or on behalf of the beneficiary. But we deem is unnecessary to discuss these questions. It is sufficient that we have found that Mr. Crockett never received the actual notice which put him in default; and therefore we find that the plaintiff is entitled to the relief prayed for in the petition, and judgment will be entered accordingly.

*James M.* and *Walter F. Brown,* for plaintiff.

*Roy Spencer,* for defendant.